IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


BARBARA B WEST,

     Plaintiff,

v.                                     CASE NO. 1:02-cv-00087-MP-AK

SHANDS HOSPITAL AND CLINICS, INC.,

     Defendant.

_____/

## O R D E R

     This matter is before the Court on Doc. 97, Motion for Summary Judgment by Shands Teaching Hospital and Clinic, Incorporated.  The plaintiff responded, doc. 105.  For the reasons given below, summary judgment is granted in favor of the defendants.

     Plaintiff, Barbara West ("West"), a black female with "strong religious convictions and practices" Second Amended Complaint, doc. 80, ¶ 16, filed suit against defendants arguing that she was discriminated against and eventually terminated from Shands Teaching Hospital because of her religion and race.  Ms. West began employment on May 5, 1980, in Shands' medical records department. (West Dep. Vol. I at 8). For approximately nineteen years, West worked in the medical records department in various capacities, including file clerk, research clerk, floater, and receptionist. (West Dep. Vol. I at 8-9).  On October 3, 1999, West was transferred to the Eastside Clinic as an office representative, where she reported to Mary Wiren.  (West Dep. Vol. I at 9).

     The parties do not dispute that the relationship between Ms. Wiren and Ms. West was always rocky.  In fact, during her tenure working for Ms. Wiren, Ms. West received numerous below-average ratings for performance of basic office tasks, and Ms. Wiren reprimanded Ms.

West on several occasions, for being rude to patients, inaccuracies in data entry, inability to perform additional assigned duties, poor teamwork in relation to front desk functions, failing to carry out her assigned task of handing out survey cards to patients, tearing up survey cards from patients that cast a negative light on her, and scolding a male patient who requested condoms that he was too young to be having sex.

Eventually, West requested a meeting with an Employee Relations Coordinator to complaint that Ms. Wiren unfairly scolded her and treated her co-worker, John Hull, a white male, with favoritism. (Freeman Dep. at 5). West claimed that Hull failed to complete his work, stole money from the deposit bag, was involved in sexual harassment including fondling of coworkers and viewing Internet pornography, all without repercussion. Id.   Also, West complained that Wiren had scolded her in front of co-workers regarding failure to complete assigned tasks, responded negatively to her requests for vacation time, and made a "racial comment" by telling West to keep the safe locked because "she didn't want the housekeeping people in it." (Freeman Dep. at 5-8; West Dep. Vol. I at 65-82, Exh. 3).

Following this meeting, the Employee Relations Coordinator ("Freeman") and a supervisor, "Kerr",  took several steps to investigate West's allegations. (Freeman Dep. at 12). On March 21, 2001, Kerr interviewed several clinic employees to determine the veracity of West's complaints. (Kerr Dep. at 8-10). During these interviews, none of the employees corroborated West's accusations. (Freeman Dep. at 16-18).  In addition, Kerr and Freeman oversaw an audit of the clinic's use of paid time off ("PTO"). (Freeman Dep. at 17-18). This audit did not reveal any discriminatory practices. Id. Kerr also conducted an investigation of the alleged mishandling of funds from the deposit bag. (Kerr Dep. at 14). Kerr could not find any

definitive proof that money had ever been missing. Id. Even if Kerr had been able to prove that money was missing, Kerr would have been unable to determine who was responsible, as more than one person had access to the deposit bag.  Id.

On the other hand, Freeman and Kerr also initiated an audit of Hull's Internet usage and discovered that Hull had indeed used the Internet on several occasions to view web sites containing images of scantily-clad women. Id. at 13. Based on this investigation, Hull was given a final warning, and told that if he engaged in any further viewing of inappropriate web sites, he would be terminated. (Freeman Dep. at 17). This corrective action was administered on April 2, 2001. (West Dep. Vol. I, Exh. 8). Freeman and Kerr met with West to discuss the investigatory findings. (West Dep. Vol. I at 117). West was informed that the investigation did not reveal any evidence of discrimination or mistreatment on the part of any member of the staff. (Freeman Dep. at 20).

Following up on the investigation, Wiren conducted a staff meeting during which she made clear that Shands would not tolerate the use of offensive language while at work, accessing of inappropriate internet sites, inappropriate touching and other horseplay in the office, or the conduct of personal business during work hours. Id. These issues were addressed as a direct result of West's complaints. (West Dep. Vol. I, Exh. 7; Freeman Dep. at 21).

Shortly thereafter, however, Ms. Wiren underwent surgery for a hernia. (West Dep. Vol. I at 145-46).  As a result of surgical complications, Wiren suffered a stroke, and became gravely ill. See id.  On Friday, May 11, 2001, upon learning that Wiren had taken a turn for the worse, West immediately emailed a fellow employee named Wanda Hines. In that email, West claimed that God had told her that He was going to put His "wrath" on Wiren:

> Well Wanda the word did say pray for those that despitefully use you. But even if
> Moses had prayed for the Egyptian he would have been praying against the will
> of God. Because for one he gave the Egyptians a chance but no matter how many
> times Moses went to Pharaoh God hardened his heart. So since he told me that he
> was going to put his wrath on her I am not going to get in the way, after all she
> had a chance to repent, but as a result of I see it the word did say that he would
> cut those off that trouble you. So praises be to God he will fight for you after all
> he is a strong deliverer. He did say hold your peace and I will fight for you and he
> also said to Moses and the Egyptians that you will not see them any more.

West Dep. Vol. I at 150-152, Exh. 10).  That same day, West spoke with Lena Brightman,

another coworker, about Wiren's condition. (West Dep. Vol. I at 156.)  West admits stating to

Brightman that "more than that is going to happen to her . . . she will reap what she sows. What

goes around comes around." (West Dep. Vol. I at 156-157, Vol. II at 29).

At around the same time, however, West participated in a prayer session among clinic

employees, during which she apparently put her arm around Wiren's mother and led a prayer for

Wiren. (West Dep. Vol. I at 166). Many employees participated in this prayer session.  Despite

this public display of concern, though, West spent additional time that day communicating to

friends and acquaintances her view that Wiren's illness signaled a divine judgment about

Wiren's treatment of West. (Kerr Dep. at 17-20).

Over the weekend, West called Brightman again and learned that Wiren had passed

away. (West Dep. Vol. I at 159.) West responded by saying that "the Lord's will has been done."

Brightman made clear to West that she did not "feel towards [Wiren] like you do," but West

nevertheless repeated her comment, stating that "the will of the Lord will be done in all of our

lives." Id.  When West returned to the office on the morning of May 14, 2001, her behavior soon

became a major topic of discussion among other clinic employees. (Kerr Dep. at 17-19). West

was observed by employees to be sending e-mails and making phone calls in which she

essentially celebrated Wiren's death. Id. Among other things, West sent an email from her office computer to another Shands employee named Gussy Boatright. In the e-mail, West stated:

> Praise the Lord Gussey God is good all the time. And he is in the delivering
> business. My supervisor has been a thorn in my side from day one but God gave
> Paul a revelation that he wished that they were cut off that trouble you and sad to
> say but God gave her time after time to repent but she was wicked as two left
> shoes. She constantly mistreated and today's she's in the judgment.

(West Dep. Vol. I at 155, Exh.11). West reportedly told coworkers "you reap what you sow" and "victory is mine, I have conquered it," as well as "vengeance is served, God bless this day!" West even sent one e-mail in which she stated "victory, victory, victory . . . Praise the Lord, victory is mine. You don't mess with a child of God!" (West Dep. Vol. I, Exh. 12).  That same day, a patient called the clinic and reported to an employee that West had called her home and left a message on her answering machine regarding Wiren's death. (Kerr Dep. at 18).

West's actions were, for obvious reasons, very upsetting to her co-workers, who were already distraught over Wiren's death. These co-workers were so upset that they were unable to perform their normal duties and instead spent much of the morning in the back of the clinic talking about West's actions. (West Dep. Vol. I at 164-165). One of the health-care providers at the clinic, an ARNP named Sandra Seymour, prepared an e-mail summarizing the comments that employees had heard West make. (West Dep. Vol. I at 166-67, Exh. 12). Kerr was notified of the disruption and was asked to come to the clinic to stabilize the situation. (Kerr Dep. at 17). A copy of Seymour's email was transmitted to Kerr. Id.

Upon her arrival, Kerr spoke with many of the employees and determined that West's actions had caused a major disruption in the clinic's activities. (Kerr Dep. at 22, 24).   As a result, on May 16, 2001, West received a corrective action form which indicated that she had been

terminated. (West Dep. Vol. I, Exh. 13).  Specifically, the corrective action form noted that West had exercised poor judgment in making her celebratory comments regarding Wiren's death, and had disrupted the work environment for the staff and providers. Id.  This suit followed.

To establish a prima facie case of race or religious discrimination, West must prove that: (1) she belongs to a protected class; (2) she was subjected to an adverse job action; (3) her employer treated similarly situated employees of other races or religions more favorably; and (4) she was qualified to do her job. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Holifield v. Reno, 115 F. 3d 1555 (11th Cir. 1997).  Shands may rebut, and therefore defeat, West's prima facie case by presenting legitimate, non-discriminatory reasons for its employment action. See Holifield, 115 F. 3d at 1564. Shands's burden in this regard is "exceedingly light." Id. Once Shands meets its burden, West may only survive summary judgment by demonstrating that the articulated reason for the adverse employment action is a mere pretext for discrimination. Id. at 1565.

As an initial matter, Ms. West has not presented evidence of a single similarly situated employee who were treated more favorably than she was.  The closest she comes is with regard to Mr. Hull.  However, her own evidence shows that Shands officials immediately investigated the complaints against him, put him on final probation, and held a staff meeting to discuss what behavior would not be tolerated.  In a similar way, Ms. West was reprimanded but not fired for the various violations of policy she admitted to committing.  It was not until her actions after the death of Ms. Wiren that she was terminated.  She has not pointed to a single instance of conduct by any other employee as egregious as celebrating the death of a supervisor.  In short, her own evidence shows that when her conduct was similar to other employees, she was treated similarly.

When her conduct went beyond the pale of acceptable behavior, she was treated more severely. Thus, she cannot show that a similarly situated employee was treated more favorably than she was treated, and thus she cannot make out a prima facie case.

Moreover, even if she could, Shands would be entitled to summary judgment because West's termination was based on legitimate, nondiscriminatory reasons.  As her supervisor Kelly Kerr explained, West was terminated for outrageous conduct that caused a disruption in the workplace among her co-employees and office staff. (Kerr Dep. at 22.) West's overt celebration of the sudden and tragic death of her supervisor, Mary Wiren, is far beyond the pale of reasonable workplace behavior.  This conduct would not be tolerated in any workplace, and certainly justified prompt and severe action by Shands.

The plaintiff, in her response, misses the point when she argues that "Plaintiff was terminated by Defendant because the statements she made about Wiren's illness and death had some sort of religious component to them." Response to Summary Judgment, doc. 105, ¶ 16.  It was not the religious component of the statement, "Praise the Lord ....God is good all the time...She constantly mistreated and today's she's in the judgment" that prompted Kerr to fire West.  It was the fact that West was openly celebrating the death of a woman she did not get along with.  And she did so on a day when the sudden death of Ms. Wiren was still being emotionally grappled with by the other employees.

In her response and affidavit, plaintiff barely even attempts to show that this reason was pretextual.  The closest she comes is when she states

> Nowhere within the statement of facts tendered by Defendant is there an
> indication that Plaintiff had knowledge that the free expression of her religion in
> reference to Wiren's death could/would create a hostile work environment or that

it was actionable by termination of her employment with Defendant.

<u>Plaintiff's response to motion for summary judgment</u>, Document 105, p. 21.  In other words, plaintiff asserts that she never had been warned that gloating about the death of a supervisor would result in termination or that she should have been warned not to exercise her religious beliefs publicly.  Even if both of those assertions were true, that does not provide evidence that the proffered reason for her termination – the insensitivity and poor judgment of her comments about Ms. Wiren's death – was false.  The Court has reviewed her response, complaint and the record evidence in this case, and finds no evidence that the defendants terminated plaintiff for any reason other than the stated reason.  Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

The motion for summary judgment, doc. 97, is GRANTED, judgment shall be entered in favor of defendant, and the Clerk is directed to close the file.

**DONE AND ORDERED** this  23rd   day of March, 2006

_____*s/Maurice M. Paul*_____
Maurice M. Paul, Senior District Judge